

FILED

AUG 1 0 2015

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA

In re   Kenneth Robert Thorne          )     Case No.   12-35545-C-7
                                       )
                                       )     ADV. No.   13-2001-C
                                       )
                                       )     BAP  No.   EC-14-1155
                                       )
_____Debtor(s)._____)

### RECEIPT OF PLEADINGS AND DOCUMENTS
### FROM THE UNITED STATES BANKRUPTCY APPELLATE PANEL

     The following documents were received by the United States Bankruptcy Court from the United States Bankruptcy Appellate Panel on  8/10/15                                    .

Proof of Service of Mandate.

_____

_____

_____

_____

_____

Dated:  8/10/15          FOR THE COURT

WAYNE BLACKWELDER, CLERK
U.S. BANKRUPTCY COURT

By: _____
      Deputy Clerk

Margaret Starr

EDC 2-770 (Rev. 09/01/10)

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: KENNETH ROBERT THORNE | |
| Debtor | BAP No. EC-14-1155-KuPaJu |
| ------------------------------ | |
| KENNETH ROBERT THORNE | Bankr. No. 12-35545<br>Adv. No. 13-02001<br>Chapter 7 |
| Appellant | |
| v. | |
| SHIRLEY ANDRE, Esquire; JOSEPH ANDRE | **FILED**<br>August 10, 2015 |
| Appellees | |

## PROOF OF SERVICE OF MANDATE

A certified copy of the attached judgment was sent to:

CLERK
U.S. BANKRUPTCY COURT
BkCt, Sacramento
U.S. Bankruptcy Court
501 I Street
Suite 3-200
Sacramento, CA 95814

Honorable Christopher M Klein
Robert T. Matsui United States Courthouse
501 I Street
Room 3-200
Sacramento, CA 958147300

on August 10, 2015
By: Vicky Jackson-Walker, Deputy Clerk

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

In re: KENNETH ROBERT THORNE

Debtor

BAP No. EC-14-1155-KuPaJu

--------------------------------

KENNETH ROBERT THORNE

Bankr. No. 12-35545
Adv. No. 13-02001
Chapter 7

Appellant

v.

SHIRLEY ANDRE, Esquire; JOSEPH ANDRE

Appellees

**FILED**
July 2, 2015

### JUDGMENT

ON APPEAL from the United States Bankruptcy Court for California Eastern - Sacramento.

THIS CAUSE came on to be heard on the record from the above court.

ON CONSIDERATION WHEREOF, it is ordered and adjudged by this Panel that the judgment of the Bankruptcy Court is **AFFIRMED in part and REVERSED in part.**

**Judge Jury Concurring.**

### FOR THE PANEL,

Susan M Spraul
Clerk of Court

**By:** Vicky Jackson-Walker, Deputy Clerk



**FILED**

JUL 02 2015

NOT FOR PUBLICATION

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   EC-14-1155-KuPaJu |
| KENNETH ROBERT THORNE, | Bk. No.   12-35545 |
|        Debtor. | Adv. No.  13-02001 |
| KENNETH ROBERT THORNE, | |
|        Appellant, | |
| v. | MEMORANDUM[*] |
| SHIRLEY ANDRE; JOSEPH ANDRE, | |
|        Appellees. | |

Argued and Submitted on May 14, 2015
at Sacramento, California

Filed – July 2, 2015

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable Christopher M. Klein, Chief Bankruptcy Judge, Presiding

_____

Appearances:    Kenrick Young argued for appellant Kenneth Robert Thorne; Summer D. Haro of Goodman & Associates argued for appellees Shirley Andre and Joseph Andre.

_____

Before: KURTZ, PAPPAS and JURY, Bankruptcy Judges.

Memorandum by Judge Kurtz
Concurrence by Judge Jury

_____

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Kenneth Robert Thorne appeals from a judgment excepting from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(4)[1] roughly $1.2 million in debt he owes to Shirley Andre and her son Joseph.[2] The bankruptcy court correctly determined that most of Thorne's debt flowed from his fraudulent conduct.  However, on this record, the bankruptcy court did not correctly except from discharge certain loan payments Thorne allegedly misappropriated. The court also erred when it ordered disgorgement of, and declared nondischargeable, all of the loan origination fees that Thorne received for the three loans the Andres partially funded. Instead, the court should have pro-rated the disgorgement.  The Andres had no entitlement to the origination fees beyond their share based on the proportion of the loans they funded.

Accordingly, we AFFIRM the bankruptcy court's nondischargeability judgment, except for the following: (1) the portion of the judgment related to $94,903.67 in allegedly misappropriated loan payments; and (2) the portion of the judgment related to $14,343.08 in loan origination fees, which were beyond the Andres' proportional share.  As to those limited portions of the judgment, we REVERSE.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  All "Civil Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] For the sake of clarity, we refer to Shirley and Joseph by their first names.  No disrespect is intended.

# FACTS

For the most part, Thorne has not challenged on appeal the bankruptcy court's findings of fact, so we have drawn much of our factual recitation from the bankruptcy court's oral ruling rendered on March 21, 2014.  The court's findings also are consistent with the joint statement of undisputed facts the parties submitted to the court at the time of their pretrial conference.

Shirley met Thorne in 1995, while she was renovating a residence she owned so that she could rent it.  After Shirley and Thorne became acquainted, Thorne, a licensed real estate broker, ended up managing the rental property on Shirley's behalf.  Over the next several years, with the assistance of Thorne, Shirley purchased and sold a number of properties – perhaps as many as thirty transactions in total.  Once Shirley added a property to her real estate portfolio, Thorne typically served as her property manager.

In this way, between 1995 and 2009, Thorne became a close business confidant of Shirley's, on whom Shirley relied for both real estate and general financial advice.  Shirley trusted Thorne completely.  In 2006, Joseph also began engaging in real estate transactions with Thorne's assistance.  Around the same time, the real estate market began to deteriorate.  In fact, the market deteriorated to such an extent that many of Shirley's real estate investments were overencumbered and were not producing sufficient revenue to carry their debt burden.  As a result, Shirley began losing the properties, either surrendering them, selling them or losing them to foreclosure.

This gravely concerned Shirley because she was counting on her real estate investments to fund her retirement. She approached Thorne, expressed her concerns regarding her real estate investments and expressed a desire to liquidate her investment portfolio in an attempt to stem the tide of losses. In response, Thorne suggested that, instead of liquidating her portfolio, Shirley could address what he perceived as a cash flow problem by becoming a hard money lender – making short term loans at higher interest rates than those charged by banks and other lending institutions.[3]

With Thorne's assistance, both Shirley and Joseph became hard money lenders. Thorne acted as a loan broker and identified a prospective borrower named George Popescu, whom he recommended to Shirley and Joseph. In total, Shirley funded four loans for Popescu, with Joseph participating as an additional lender in one of these four loan transactions.[4] Before Shirley and Joseph funded these loans, Thorne represented that the loans would be fully secured – secured by real estate collateral that had

---

[3] Whereas Shirley and the bankruptcy court characterized Thorne's suggestions as advice given to a client by a licensed real estate professional, Thorne characterized his suggestions as if they were merely brainstorming between sophisticated colleagues both engaged in their own separate real estate investment endeavors. Both the history of services Thorne provided to the Andres and the compensation he earned from providing those services – particularly the loan origination fees he collected upon the closing of the hard money loans – support the court's characterization.

[4] Popescu fully repaid one of these four loans. While the specifics of the three loans not repaid are material to our analysis, the specifics of the fourth loan are not further discussed in this decision.

1   sufficient equity to cover the full amount of the loan.   Thorne

2   further expressed certainty that Popescu could and would repay

3   these loans.

4        With respect to most of Popescu's real property collateral,

5   Thorne did not disclose to Shirley or Joseph the existence or

6   amount of the senior deeds of trust held against the property,

7   which secured millions of dollars in senior debt, even though he

8   was aware of the senior debt from preliminary title reports he

9   received.   Nor did Thorne disclose the extent of his own loans to

10  Popescu.   Shirley passed on to Joseph whatever information she

11  received from Thorne regarding Popescu and the collateral.

12       The first loan Shirley funded was secured by real property

13  located on Fair Oaks Boulevard in Carmichael, California.   Joseph

14  also participated in this transaction.   The money that Shirley

15  and Joseph lent against the Fair Oaks property was part of a loan

16  modification.   Thorne and another woman named Victoria Neutra

17  already had lent Popescu $450,000, which loan was modified by way

18  of Shirley and Joseph's additional advances.   In exchange for a

19  pro-rata interest in a modified note and deed of trust on the

20  Fair Oaks property, Shirley lent Popescu $125,000 and Joseph lent

21  Popescu $55,000.   The principal amount of the modified note was

22  $630,000, with each lender receiving a proportional ownership

23  interest in the modified note based on the amount of money they

24  lent.[5]   Thorne received out of escrow $7,200 as an origination

25  fee for brokering the modified Fair Oaks loan.

26  _____

27       [5]The lenders' respective proportional interests in the
    modified Fair Oaks note were as follows: Thorne (43.65%); Neutra
28  (27.78%); Shirley (19.84%); Joseph (8.73%).

1          The second loan Shirley funded was secured by real property

2     located on Patton Avenue in Citrus Heights, California.

3     Shirley's loan secured by the Patton property was part of an

4     original loan transaction pursuant to which Shirley lent Popescu

5     $75,000 and Thorne lent Popescu $55,000.  Shirley and Thorne each

6     received a proportional ownership interest in the note based on

7     the amount of money they lent.[6]  Thorne received out of escrow

8     $5,200 as an origination fee for brokering the Patton loan.

9          The third loan Shirley funded was secured by real property

10    located on Eschinger Road in Elk Grove, California.  Shirley's

11    loan secured by the Eschinger property was part of an original

12    loan transaction pursuant to which Thorne lent Popescu $125,000,

13    Shirley lent Popescu $25,000 and a woman by the name of Olga

14    Chiang lent Popescu $50,000.  The principal amount of the

15    Eschinger note was $200,000, with each lender receiving a

16    proportional ownership interest in the Eschinger note based on

17    the amount of money they lent.[7]  Thorne received out of escrow

18    $8,000 as an origination fee for the Eschinger loan.

19         When Popescu fell behind on his loan payments, Thorne at

20    first told Shirley that Popescu likely was just busy and forgot

21    to pay.  At some later point, in 2008, it became clear that

22    Popescu was struggling to timely make his loan payments, but

23    Thorne remained optimistic regarding repayment of the Popescu

24    _____

25         [6]The lenders' respective proportional interests in the
26    Patton note were as follows: Shirley (57.69%); Thorne (42.31%).

27         [7]The lenders' respective proportional interests in the
      Eschinger note were as follows: Thorne (62.5%); Chiang (25%);
28    Shirley (12.5%).

1  loans, and Thorne expressed his optimism to Shirley.  In reality,

2  in 2009 and 2010, Popescu lost many of his properties to

3  foreclosure, including the collateral for the loans Shirley and

4  Joseph had participated in.  Even though Thorne recorded requests

5  entitling him to notice in the event notices of default were

6  recorded against the collateral by senior lienholders, Thorne

7  never advised either Shirley or Joseph that the senior

8  lienholders had commenced foreclosure proceedings against the

9  collateral.  Shirley did not learn of the foreclosures until

10  January 2011, when she went to the county recorder's office in an

11  attempt to ascertain the status of the collateral securing her

12  loans to Popescu.  At that time, she learned the full extent of

13  senior debt that had encumbered the collateral as well as the

14  fact that the senior lenders had foreclosed on each of the

15  parcels of real property collateral, thereby extinguishing her

16  and Joseph's rights as junior lienholders.

17       In September 2011, the Andres commenced a state court action

18  against Thorne and Popescu for, among other things, fraud and

19  breach of fiduciary duty.  In 2012, Thorne commenced a chapter 13

20  bankruptcy case, which was converted to chapter 7 later that same

21  year.  In January 2013, the Andres filed their

22  nondischargeability action against Thorne.  After holding a

23  trial, the bankruptcy court found in favor of the Andres on their

24  claims for relief under § 523(a)(2)(A) and (a)(4).  Thorne timely

25  appealed.

26                          **JURISDICTION**

27       The bankruptcy court had jurisdiction pursuant to 28 U.S.C.

28  §§ 1334 and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C.

1  § 158.

2                                    **ISSUE**

3        Did the bankruptcy court correctly determine that Thorne's

4  indebtedness to Shirley and Joseph was nondischargeable under

5  § 523(a)(2)(A) and (a)(4)?

6                          **STANDARDS OF REVIEW**

7        We review de novo the bankruptcy court's legal conclusions,

8  and we review for clear error its factual findings as to whether

9  the requisite nondischargeability elements are present.  Tallant

10  v. Kaufman (In re Tallant), 218 B.R. 58, 63 (9th Cir. BAP 1998).

11  Findings of fact are clearly erroneous only if they are

12  illogical, implausible, or without support in the record.  Retz

13  v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir.2010).

14                              **DISCUSSION**

15        To except a debt from discharge under § 523(a)(2)(A), a

16  creditor must prove by a preponderance of the evidence the

17  following elements:

18              (1) the debtor made [false] representations;
                (2) that at the time he knew they were false;
19              (3) that he made them with the intention and purpose of
                deceiving the creditor;
20              (4) that the creditor relied on such representations;
                [and]
21              (5) that the creditor sustained the alleged loss and
                damage as the proximate result of the
22              misrepresentations having been made.

23  Gomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir.

24  2010)(quoting Am. Express Travel Related Servs. Co. v. Hashemi

25  (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1996)).  At one

26  time, the Ninth Circuit also required the creditor to prove that

27  the debtor benefitted from the fraud.  In re Sabban, 600 F.3d at

28  1222.  However, in light of the Supreme Court's decision in

                                      8

1   <u>Cohen v. de la Cruz</u>, 523 U.S. 213, 223 (1998), the Ninth Circuit

2   now only requires that the liability arise or flow from the

3   fraud.  No direct or indirect benefit is required.  <u>Id.</u>; <u>Gomeshi</u>

4   <u>v. Sabban (In re Sabban)</u>, 384 B.R. 1, 7-8 (9th Cir. BAP 2008)

5   <u>aff'd</u>, 600 F.3d 1219 ("Because [the debtor's liability] did not

6   arise or flow from Debtor's fraudulent conduct, the bankruptcy

7   court correctly held that section 523(a)(2)(A) did not apply to

8   that debt.").

9       Whether the debtor's liability arose or flowed from the

10   fraud is, in essence, an inquiry into proximate cause.  <u>See</u>

11   <u>In re Sabban</u>, 600 F.3d at 1223.  Proximate cause is a question of

12   fact reviewed under the clearly erroneous standard.  <u>See</u>

13   <u>In re Tallant</u>, 218 B.R. at 63.

14       Thorne on appeal has not disputed that the Andres suffered

15   losses as a result of their lending money to Popescu, but Thorne

16   in essence claims that these losses were not proximately caused

17   by any fraudulent conduct on his part.  In part, Thorne contends

18   that the bankruptcy court wrongly faulted him for not

19   anticipating in 2006, and warning the Andres regarding, the 2007

20   world financial markets collapse.  Thorne further contends that

21   the Andres admitted at trial that they did not consider material

22   whether senior liens existed on the property.  Thorne also

23   contends that any statements he made (or any failure to disclose)

24   regarding Popescu's financial health constituted oral

25   representations regarding the borrower's financial condition,

26   which are not covered by either § 523(a)(2)(A) or (B).

27       Even if we were to rule in favor of Thorne on each of these

28   contentions, this would not establish that the bankruptcy court

1  committed reversible error in its § 523(a)(2)(A) ruling.
2  Thorne's contentions largely ignore the key misrepresentation on
3  which the court's § 523(a)(2)(A) ruling was based: that there was
4  sufficient equity in the real property collateral such that the
5  Andres' loans would be fully secured.  The bankruptcy court's
6  ruling repeatedly referenced Thorne's statements that there was
7  sufficient equity in the real property collateral, thereby
8  emphasizing the critical role Thorne's representations regarding
9  equity played.  See Tr. Trans. (March 21, 2014) at 10:22-11:11,
10  13:15-17, 14:6-10, 15:22-16:6, 17:7-11.

11       In its § 523(a)(2)(A) ruling, the bankruptcy court found
12  that Thorne knew that his representations regarding equity were
13  false, that he knowingly made these misrepresentations to the
14  Andres, that he thereby induced the Andres to lend money to
15  Popescu, that the Andres' reliance on these representations was
16  justifiable and that the Andres suffered damages as a proximate
17  result thereof.  For the most part, Thorne does not challenge
18  these findings.  We typically accept as correct findings the
19  appellant has not challenged on appeal.  See Sachan v. Huh
20  (In re Huh), 506 B.R. 257, 272 (9th Cir. BAP 2014) (en banc); see
21  also Affordable Housing Dev. Corp. v. Fresno, 433 F.3d 1182, 1193
22  (9th Cir. 2006) (stating that appellate court ordinarily will not
23  consider matters "not specifically and distinctly argued in
24  appellant's opening brief.").

25       The closest Thorne comes to challenging these findings is by
26  arguing that his representations regarding there being equity in
27  the collateral were mere opinions regarding the value of the real
28  property.  In support of this argument, Thorne relies on a

                                  10

1  statement taken out of context from <u>Loomas v. Evans</u>
2  <u>(In re Evans)</u>, 181 B.R. 508, 512 (Bankr. S.D. Cal. 1995), which
3  provides as follows: "A representation of value generally is
4  merely a statement of opinion and, as such, it 'does not support
5  a fraud claim either under common law or under the Bankruptcy
6  Code.'" <u>Id.</u> (quoting <u>Mortg. Guar. Ins. Corp. v. Pascucci</u>
7  <u>(In re Pascucci)</u>, 90 B.R. 438, 444 (Bankr. C.D. Cal. 1988)).
8  However, <u>In re Evans</u> does not support Thorne's argument.
9  <u>In re Evans</u> went on to hold that Evans' false statements
10 regarding the value of certain real property were sufficient to
11 support a claim for nondischargeability under § 523(a)(2)(A).
12 <u>Id.</u> at 512-13.  In so holding, <u>In re Evans</u> explained that
13 valuation opinions are actionable fraud under California law and
14 under § 523(a)(2)(A) when the debtor makes such statements of
15 value knowing them to be false, or with reckless indifference to
16 the truth of those statements, for the purpose of inducing the
17 creditor to act in reliance upon those statements.  <u>Id.</u>; <u>see also</u>
18 <u>Rubin v. West (In re Rubin)</u>, 875 F.2d 755, 759 (9th Cir. 1989).
19 This is precisely what the bankruptcy court found happened here.
20 Consequently, we reject Thorne's argument that his statements
21 regarding equity in the collateral were non-actionable opinions
22 regarding value.
23      Thorne's more general argument regarding the bankruptcy
24 court's fraud findings - that the damages the Andres suffered
25 cannot be attributed to any fraud on his part - at bottom calls
26 into question the bankruptcy court's proximate cause findings.
27 Accordingly, we will look at the bankruptcy court's damages award
28 to consider whether those damages arose or flowed from Thorne's

11

1   fraud.  <u>In re Sabban</u>, 384 B.R. at 7-8.

2        The bankruptcy court awarded the Andres $487,796.23 in

3   compensatory damages, which consisted of all of the principal

4   owed and interest accrued on the Popescu loans (based on the

5   agreed-upon interest rate specified in the notes), minus a credit

6   for interest payments the Andres received.[8]  Permitting the

7   Andres to recover their contracted-for rate of interest is an

8   appropriate measure of their fraud damages under California law.

9   See <u>Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.</u>, 189 F.3d 1017,

10  1032-33 (9th Cir. 1999)(stating that fraud plaintiff is entitled

11  under California law to recover benefit-of-the-bargain damages

12  based on defendant-fiduciary's fraud), <u>partially overruled on</u>

13  <u>other grounds by</u>, <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336,

14  342-45 (2005); <u>Roussos v. Michaelides (In re Roussos)</u>, 251 B.R.

15  86, 93 (9th Cir. BAP 2000) <u>aff'd</u>, 33 F. App'x 365 (9th Cir. 2002)

16  (same).

17       The bankruptcy court also awarded the Andres $178,396.23,

18  which was a doubling of Shirley's damages from the Patton and

19  Eschinger loans pursuant to Cal. Welf. & Inst. Code § 15610.30

20

21

22  _____

23       [8]These damages included: (1) principal and interest on the
    Fair Oaks loan in the amount of $309,400 ($180,000 principal,
24  plus 12% interest in the amount of $156,600, less aggregate
    interest payments received of $27,200); (2) principal and
25  interest on the Patton loan in the amount of $132,688 ($75,000
    principal, plus 13% interest in the amount of $67,437.50, less
26  aggregate interest payments received of 9,749.60); and
    (3) principal and interest on the Eschinger loan in the amount of
27  $45,708 ($25,000 principal, plus 14% interest in the amount of
    $23,625.03, less aggregate interest payments of $2,916.70).
28

1  and Cal. Prob. Code § 859.[9]  The Welfare and Institutions Code

2  statute provides in relevant part:

3      (a) "Financial abuse" of an elder or dependent adult
       occurs when a person or entity does any of the
4      following:

5      (1) Takes, secretes, appropriates, **obtains,** or retains
       real or **personal property of an elder** or dependent
6      adult for a wrongful use or **with intent to defraud,** or
       both.

7

8  Cal. Welf. & Inst. Code § 15610.30(a)(1) (emphasis added).  In

9  turn, the Probate Code statute provides:

10     If a court finds that a person has in bad faith
       wrongfully taken, concealed, or disposed of property
11     belonging to a conservatee, a minor, an elder, a
       dependent adult, a trust, or the estate of a decedent,
12     or has **taken,** concealed, or disposed of the **property** by
       the use of undue influence in bad faith or **through the**
13     **commission of elder or dependent adult financial abuse,**
       **as defined in Section 15610.30 of the Welfare and**
14     **Institutions Code, the person shall be liable for twice**
       **the value of the property recovered by an action under**
15     **this part.**

16  Cal. Prob. Code § 859 (emphasis added).

17      The bankruptcy court also awarded $400,000 in punitive

18  damages based on California's exemplary damages statute, which

19  provides in relevant part:

20     (a) In an action for the breach of an obligation not
       arising from contract, **where** it is proven by clear and
21     convincing evidence that **the defendant has been guilty**
       **of** oppression, **fraud,** or malice, the plaintiff, in
22     addition to the actual damages, may recover damages for
       the sake of example and by way of punishing the
23     defendant.

24     *    *    *

25

26  ──────────────

27      [9]The $178,396.23 is the sum of $132,688 in principal and
    interest lost in connection with the Patton loan and the $45,708
28  in principal and interest lost in connection with the Eschinger
    loan.

1    c) As used in this section, the following definitions
2    shall apply:

     \*   \*   \*

3
     **(3) "Fraud" means an intentional misrepresentation,**
4    **deceit, or concealment of a material fact known to the**
     **defendant with the intention on the part of the**
5    **defendant of thereby depriving a person of property or**
     **legal rights or otherwise causing injury.**
6

7    Cal. Civ. Code § 3294(a) & (c)(3) (emphasis added).

8        In light of the bankruptcy court's fraud findings and the
9    applicable California statutes, the above referenced types of
10   damages patently arose or flowed from Thorne's fraud.  See
11   In re Sabban, 600 F.3d at 1223; see also Cohen, 523 U.S. at 216
12   (affirming bankruptcy court judgment excepting from discharge
13   punitive damages premised on fraud).  More to the point, as to
14   each of these types of damages, we cannot say that the bankruptcy
15   court's proximate cause findings were illogical, implausible or
16   without support in the record.  See In re Retz, 606 F.3d at 1196.

17       The remaining damages that the bankruptcy court awarded
18   consisted of two distinct sums of money that the court ordered
19   Thorne to disgorge on two distinct grounds.  The bankruptcy
20   court's disgorgement awards necessitate a closer examination in
21   order to ascertain whether they were premised on Thorne's fraud.
22   We will separately consider each sum the court ordered disgorged.

23       The first sum the court ordered Thorne to disgorge consisted
24   of loan origination fees in the aggregate amount of $20,400,
25   which Thorne received for brokering the Fair Oaks, Patton and
26   Eschinger loans.  While the court did not explicitly state the
27   basis for ordering disgorgement of the loan origination fees, our
28   review of the record convinces us that the bankruptcy court

                              14

1    adopted the grounds for disgorgement posited by the Andres in

2    their trial brief, which was premised on Thorne's fraud.  As the

3    Andres stated in their trial brief:

> Thorne only received those fees because he convinced
> Shirley and Joseph to provide the loans.  If Shirley
> and Joseph had known all the material facts about those
> loans, as Thorne was obligated to tell them, e.g. that
> the properties' liens exceeded their value, and that
> their value had not been verified, then they would not
> have provided those loans.

8    Plf. Tr. Brf. (Feb. 4, 2014) at 27:14-18.

9         The legal authority cited by the Andres also implicates

10   Thorne's fraud.  Of particular note is the Andres' citation to

11   Ward v. Taggart, 51 Cal. 2d 736 (1959).  In Ward, a real estate

12   broker named Taggart defrauded the plaintiffs during the course

13   of a real estate sales transaction and thereby obtained roughly

14   $72,000 in profit.  Id. at 739-40.  On appeal from a judgment in

15   favor of the plaintiffs, the California Supreme Court affirmed

16   the $72,000 award against Taggart.  In so ruling, the Ward court

17   noted that Taggart did not have any fiduciary or even agency

18   relationship with the plaintiffs.  Id. at 741.  Nonetheless,

19   based on Taggart's fraud, the Ward court held that Taggart's

20   disgorgement of the $72,000 in profit could be affirmed under

21   unjust enrichment principles.  Id. at 741-42.  In so holding,

22   Ward stated:

> Even though Taggert [sic] was not plaintiff's agent,
> the public policy of this state does not permit one to
> "take advantage of his own wrong." [A]nd the law
> provides a quasi-contractual remedy to prevent one from
> being unjustly enriched at the expense of another.
> Section 2224 of the Civil Code provides that one "who
> gains a thing by fraud * * * or other wrongful act, is
> **unless he has some other and better right thereto,** an
> involuntary trustee of the thing gained, for the
> benefit of the person **who would otherwise have had it.**"
> As a real estate broker, Taggart had the duty to be

1   honest and truthful in his dealings.  The evidence is
    clearly sufficient to support a finding that Taggart
2   violated this duty.  Through fraudulent
    misrepresentations he received money that plaintiffs
3   would otherwise have had.  Thus, Taggart is an
    involuntary trustee for the benefit of plaintiffs on
4   the secret profit of $1,000 per acre that he made from
    his dealings with them.

5

6   Id. at 741. (footnote and citations omitted) (emphasis added).

7         On the one hand, Ward establishes that at least some of the

8   loan origination fees flowed from Thorne's fraud and could be

9   ordered disgorged under California law.  On the other hand, the

10  emphasized portions of the quote from Ward also establish an

11  inherent limitation on that disgorgement.  To the extent the

12  Andres had no entitlement or claim to the origination fees, there

13  was no basis for the bankruptcy court to award the fees to the

14  Andres.  In the parlance of Ward, Thorne in that instance would

15  have had "an other and better right thereto" and the Andres would

16  not "otherwise have had [the fees]."

17        There is nothing in the record suggesting any grounds for

18  awarding the Andres the full amount of the loan originations fees

19  for all three loans, which the Andres only partially funded.

20  Instead, the Andres' entitlement to the fees necessarily was

21  limited to a pro-rata share based on the proportion of their

22  funding of the loans in relation to the total amount loaned by

23  all of the loan participants.  The Andres' pro-rata share of the

24  fees should have been $6,056.92.[10]  Consequently, the bankruptcy

25  _____

26        [10] Shirley and Joseph's pro-rata share of the origination
    fees from the Fair Oaks loan ($2,057.04), plus Shirley's pro-rata
27  share of the origination fees from the Patton loan ($2,999.88),
    plus Shirley's pro-rata share of the origination fees from the
28                                          (continued...)

court erred to the extent of $14,343.08 – the extent to which its judgment included an award based on the origination fees in excess of $6,056.92.[11]

    The bankruptcy court also ordered Thorne to disgorge $95,417 in loan payments he received from Popescu. However, the basis for disgorgement of the $95,417 was completely different than the basis for disgorgement of the loan origination fees. The Andres asserted that Thorne did not adequately account for these loan payments. According to the Andres, he should have paid the full $95,417 to them, or at least adequately explained what happened to the rest of these payments. The Andres calculated the loan payments to be disgorged as follows:

| | |
|---|---|
| [Popescu's payments to Thorne for] Fair Oaks Loan: | $94,500 |
| Paid to Shirley: | $18,850 |
| Paid to Joseph: | $7,800 |
| <u>Unaccounted for:</u> | <u>$67,850</u> |
| | |
| [Popescu's payments to Thorne for] Patton Avenue Loan: | $16,900 |
| Paid to Shirley: | $9,749.60 |
| <u>Unaccounted for:</u> | <u>$7,150.40</u> |
| | |
| [Popescu's payments to Thorne for] Eschinger Loan: | $23,333.30 |
| Paid to Shirley: | $2,916.70 |
| <u>Unaccounted for:</u> | <u>$20,416.60</u> |
| **Total Unaccounted For Funds:** | **$95,417** |

Plf. Tr. Brf. (Feb. 4, 2014) at 26:22-27:6. The evidence at

_____

[10](...continued)
Eschinger loan ($1,000).

[11]Aggregate origination fees from the three loan transactions ($20,400), less the aggregate amount of Shirley and Joseph's pro-rata share ($6,056.92).

1    trial supported the Andres calculations.[12]

2         According to the bankruptcy court, disgorgement of the

3    $95,417 was appropriate because Thorne failed to provide

4    contemporaneous regular accountings to the Andres, commingled

5    funds, and never adequately explained the disposition of the

6    $95,417. In short, the record establishes that the court based

7    the disgorgement of the $95,417 on Thorne's alleged

8    misappropriation or failure to adequately account for Popescu's

9    loan payments, rather than on Thorne's fraud. Indeed, on this

10   record, we don't see any evidence that would have enabled the

11   court to correctly find that Thorne's liability for the $95,417

12   flowed from Thorne's fraud.

13        As a result, § 523(a)(2)(A) was not appropriate grounds for

14   the nondischargeability of the $95,417 in disgorged loan payments

15   because Thorne's fraud did not proximately cause that liability.

16   Thus, we must consider whether the nondischargeability of the

17   $95,417 was correctly founded on § 523(a)(4), which was the only

18   other grounds for nondischargeability the court relied upon.[13]

19        Under § 523(a)(4), debts for fraud or defalcation while

20

21        [12]Thorne offered a summary of loan payments as an exhibit at
22   trial, and the summary was admitted into evidence without
     objection. With one minor exception - a $513 payment to Joseph -
23   the summary is consistent with the Andres' calculations, at least
     with respect to the amount of payments Thorne received from
24   Popescu and the amount of payments Thorne disbursed to the
25   Andres.

26        [13]Because the other aspects of the bankruptcy court's
     nondischargeability judgment were adequately supported by the
27   court's § 523(a)(2)(A) ruling, we decline to consider § 523(a)(4)
     except as necessary to determine whether there were adequate
28   nondischargeability grounds for the $95,417.

                                  18

1  acting in a fiduciary capacity are nondischargeable.  While the
2  terms "defalcation" and "fiduciary capacity" might have broader
3  meanings under nonbankruptcy law, these terms are defined
4  narrowly for nondischargeability purposes.  See Bullock v.
5  BankChampaign, N.A., 133 S.Ct. 1754, 1759 (2013) (holding that
6  defalcation as used in § 523(a)(4) requires a showing of bad
7  faith, moral turpitude, or other immoral conduct, or a culpable
8  state of mind equivalent to intentional wrongdoing or criminally
9  reckless misconduct); Cal-Micro, Inc. v. Cantrell
10 (In re Cantrell), 329 F.3d 1119, 1125 (9th Cir. 2003) (holding
11 that the broad definition of a fiduciary – anyone in whom a
12 special trust and confidence has been reposed – does not apply to
13 § 523(a)(4)).  The narrow construction of these terms is
14 consistent with the dictate that exceptions to discharge should
15 be narrowly construed.  Snoke v. Riso (In re Riso), 978 F.2d
16 1151, 1154 (9th Cir. 1992); see also Bullock, 133 S. Ct. at
17 1760-61 (stating that exceptions to discharge "should be confined
18 to those plainly expressed.").

19      The applicable, narrow definition of the term "fiduciary
20 capacity" requires the creditor to demonstrate the existence of
21 an express or technical trust that was created before and without
22 reference to the wrongdoing from which the liability arose.
23 In re Cantrell, 329 F.3d at 1125.  Additionally, when the
24 § 523(a)(4) claim rests on a trust imposed by statute, the
25 statute must clearly identify both the fiduciary's duties and the
26 trust's property.  Honkanen v. Hopper (In re Honkanen), 446 B.R.
27 373, 379 (9th Cir. BAP 2011); Evans v. Pollard (In re Evans),
28 161 B.R. 474, 477-78 (9th Cir. BAP 1993).

1    The $95,417 in loan payments that the bankruptcy court here
2    ordered Thorne to disgorge were subject to a statutory trust
3    pursuant to Cal. Bus. & Prof. Code § 10145, before and without
4    reference to Thorne's alleged misappropriation and/or failure to
5    account for these funds.  Generally speaking, Cal. Bus. & Prof.
6    Code § 10145 requires real estate brokers, when they accept funds
7    belonging to others in connection with a real estate loan
8    transaction, to immediately do one of the following: (1) place
9    them in escrow, (2) place them in the hands of their principal,
10   or (3) place them in a trust fund account maintained by the
11   broker.  Cal. Bus. & Prof. Code § 10145; see also Cal. Bus. &
12   Prof. Code § 10131.

13       In addition, the statute describes other duties of the
14   fiduciary that arise when he or she accepts such funds.  For
15   instance, subsection (g) of the statute requires the broker to
16   "maintain a separate record of the receipt and disposition" of
17   such funds.  Cal. Bus. & Prof. Code § 10145(g).  Both the Ninth
18   Circuit Court of Appeals and this panel have opined that this
19   statute creates a statutory trust and imposes fiduciary
20   obligations on real estate brokers of the type covered by
21   § 523(a)(4).  See Otto v. Niles (In re Niles), 106 F.3d 1456,
22   1459 (9th Cir. 1997); In re Evans, 161 B.R. at 478.

23       Here, the bankruptcy court faulted Thorne for failing to
24   provide the Andres with routine periodic accountings, commingling
25   Popescu's loan payments with other funds, and never adequately
26   explaining the ultimate disposition of the $95,417.  We have no
27   issue with the first two findings, but we are perplexed by the
28   third finding, on which the nondischargeability of Thorne's

1   disgorgement liability necessarily hinges.  Unless there was some
2   amount of the $95,417 that Thorne either misappropriated or never
3   adequately explained how it was disposed of, we cannot agree with
4   the bankruptcy court that Thorne's disgorgement liability was
5   nondischargeable under § 523(a)(4).  See Blyler, et al. v.
6   Hemmeter (In re Hemmeter), 242 F.3d 1186, 1190-91 (9th Cir.
7   2001).

8        While not on all fours, In re Hemmeter is instructive.  In
9   In re Hemmeter, pension plan participants commenced a
10  nondischargeability action against the debtor, alleging that
11  losses suffered by the plans were nondischargeable under
12  § 523(a)(4).  Id. at 1189.  The employee plan participants
13  further alleged that the plan losses resulted from the debtor's
14  investment of plan funds in the stock of the employer company
15  that had established the pension plans.  Id. at 1191.  In
16  affirming the bankruptcy court's Civil Rule 12(b)(6) dismissal,
17  In re Hemmeter explained that the plans specifically authorized
18  plan fiduciaries to invest plan funds in the employer company's
19  stock.  Id.  Thus, In re Hemmeter stands for the proposition that
20  § 523(a)(4) is not implicated when the fiduciary uses trust funds
21  in a manner the trust explicitly authorized.  Id.; see also
22  Restatement (Third) of Trusts § 78, comments c(2) and c(3) (2007)
23  (permitting trustee to engage in self-dealing transactions or
24  other prohibited transactions when the trust terms authorize such
25  transactions or the trust beneficiaries consent to such

26
27
28

1  transactions).[14]

2       In this appeal, there is evidence in the record that the

3  Andres consented to the disposition of the $95,417 in the manner

4  Thorne actually disbursed those funds.  The notes themselves

5  (which the Andres approved as to form) stated that the Andres

6  held only partial ownership interests in the notes and thereby

7  indicated that the Andres held only a pro rata right to loan

8  payments equal to the percentage of their partial ownership

9  interests.  In turn, the escrow instructions for the Patton loan

10 transaction and the Eschinger loan transaction explicitly

11 referenced pro rata distribution of loan/interest payments.[15]  As

12 for the Fair Oaks loan, in a fax letter to the escrow company

13 dated May 7, 2007, (roughly five months after the closing of the

14 Fair Oaks loan transaction) Shirley expressed her general

15 satisfaction with the manner in which Thorne had been

16

17       [14]In interpreting California trust law, California courts
   generally follow the Restatement (Third) of Trusts.  In re Estate
18 of Giraldin, 55 Cal. 4th 1058, 1072 (2012); see also Uzyel v.
   Kadisha, 188 Cal. App. 4th 866, 905 (2010) (following § 78 of the
19 restatement).

20
       [15]At trial, Shirley's counsel offered the Patton escrow
21 instructions into evidence as plaintiffs' exhibit 23, and the
   bankruptcy court admitted those instructions into evidence
22 without objection and for all purposes.  Nonetheless, Shirley
   later claimed during her testimony that, even though her
23 signature on the escrow instructions looks like her signature,
   she did not recall seeing or signing the Patton escrow
24 instructions, and she suspected that her signature on that
   document was a forgery.  Even if we assume the truth of Shirley's
25 forgery claim, the Patton escrow instructions are cumulative of
   the other evidence referenced above establishing that Shirley
26 knew that she held only a partial ownership interest in the Fair
   Oaks, Patton and Eschinger loans and that she only expected a pro
27 rata share of interest payments made on those loans.

28

                                22

distributing the Fair Oaks loan payments.  Indeed, in this letter, Shirley indicates that she and Joseph expected (and were receiving) a specific amount – $1,250 for her and $550 for Joseph – as their respective shares of the monthly Fair Oaks loan payments.

Moreover, we have found no evidence in the record indicating that, before litigation between the parties commenced, either Shirley or Joseph were entitled to or claimed a right to monthly loan payments in excess of the pro rata amounts.  We understand that the Andres are now arguing that, in light of Thorne's fiduciary status, he had a duty to give the Andres' interests complete and absolute priority over his own self-interest and, hence, he should have paid to them the entire $95,417 -- the entire amount of Popescu's payments on these three loans.  However, we reject this argument as meritless because, as set forth above, the evidence in the record establishes that the Andres consented to the pro rata distribution of these loan payments, and there is no contrary evidence.

We also understand the Andres' alternate argument: that Thorne "must have received" additional payments from Popescu for the Fair Oaks, Patton and Eschinger loans, and because Thorne (in breach of his fiduciary duties) never disclosed any loan payments beyond the $95,417, the Andres at a minimum should be entitled to recover the entire $95,417.  However, there is a fatal defect in this argument.  It presumes, without any supporting evidence, that Thorne actually received additional payments from Popescu for the Fair Oaks, Patton and Eschinger loans.  The evidence in the record only supports the existence of the $95,417 in payments

1    on those loans.  There is no evidence in the record of any

2    additional payments on those specific loans above and beyond the

3    $95,417.  Consequently, the Andres' argument regarding additional

4    loan payments (in the absence of any evidence of such payments)

5    runs afoul of <u>In re Niles</u>, 106 F.3d at 1462, which in relevant

6    part held that a creditor asserting a claim under § 523(a)(4) for

7    misappropriation or failure to account for trust funds has the

8    burden of proof to establish in the first instance that such

9    funds were entrusted to the debtor.  As stated in <u>In re Niles</u>:

10            We conclude that Otto satisfied her burden of proof by
             establishing that Niles was a fiduciary to whom funds
11           had been entrusted.  The burden then shifted to Niles
             to account fully for all funds received by her for
12           Otto's benefit, by persuading the trier of fact that
             she complied with her fiduciary duties with respect to
13           all questioned transactions.

14   <u>Id.</u>

15           In sum, neither the law nor the evidence in the record

16   supports the bankruptcy court's ruling that Thorne's disgorgement

17   liability for the $95,417 should be excepted from discharge under

18   § 523(a)(4).  We therefore must REVERSE the bankruptcy court's

19   nondischargeability ruling with respect to most of the $95,417

20   because neither § 523(a)(2)(A) nor § 523(a)(4) adequately support

21   that ruling.  We say "most of the $95,417" because there is one

22   minor exception to this reversal.  Thorne admitted in his summary

23   of payments that he was attempting to give himself credit for

24   $513.33 paid to Joseph by the escrow company rather than by him.

25   Thorne has not offered any reason why he should receive credit

26   for a payment from escrow when the proper subject of the

27   accounting was amounts **he** received and amounts **he** disbursed for

28   the Fair Oaks, Patton and Eschinger loans.  Therefore, in the

1  final analysis, our partial reversal effectively reduces the

2  amount of the bankruptcy court's nondischargeability judgment by

3  $94,903.67 ($95,417, less $513.33).

4      There is another $5,000 that Thorne received from Popescu in

5  or around September 2008.  The way Thorne received and disbursed

6  the $5,000 is problematic.  By that point in time, Popescu

7  apparently was in default on most or all of his loans.  According

8  to Thorne's testimony and a letter Thorne wrote to a group of

9  between eight and ten "investors" dated September 22, 2008,

10  Popsecu paid Thorne the $5,000 as "a sign of good faith" to his

11  lenders that he was not going to walk away from his debt

12  obligations.  Thorne in turn parceled out the $5,000 between

13  himself and Popescu's other lenders supposedly based on how much

14  in aggregate each lender lent, rather than attributing the $5,000

15  to any particular loan.  Thorne himself retained a little less

16  than half of the $5,000 and the Andres received $100 each.

17      If Thorne had disbursed the $95,417 in this manner, our

18  holding regarding the $95,417 very well might have been

19  different.  However, there is no indication that the Andres

20  included the $5,000 in their calculation of the $95,417 Pospecu

21  paid on the Fair Oaks, Patton and Eshinger loans.  Nor is there

22  any such indication in the documentary evidence the parties

23  submitted.  More importantly, there is no indication that the

24  bankruptcy court made any rulings regarding the $5,000.  The

25  bankruptcy court's ruling applied only to the $95,417, as

26  calculated by the Andres.  If the Andres desired additional or

27  amended findings, or an increase in the nondischargeability

28  judgment by $5,000, they could have requested those items from

25

1   the bankruptcy court or could have filed their own appeal.
2   Because they did not do so, the bankruptcy court's treatment (or
3   non-treatment) of the $5,000 is beyond the scope of this appeal.

4       The only other argument we must address concerns Thorne's
5   statute of limitations defense.  Thorne claimed in both the
6   bankruptcy court and in his opening appeal brief that the Andres
7   had knowledge of the facts underlying Thorne's fraud in 2007, so
8   the applicable three-year limitations period for fraud actions
9   ran before the Andres filed either their 2011 state court action
10  or their 2013 nondischargeability action.

11      Thorne relies upon the three year limitations period for
12  fraud set forth in Cal. Civ. Proc. Code § 338(d), but this
13  statute also provides that a fraud cause of action does not
14  accrue until the aggrieved party discovers the facts constituting
15  the fraud.  Thorne claims that, in 2007, the Andres had actual
16  knowledge of sufficient facts for the fraud cause of action to
17  accrue at that time.  However, the bankruptcy court disagreed
18  with Thorne on this point.  The court specifically found that the
19  Andres did not discover the facts constituting the fraud until
20  sometime in 2011, after Shirley visited the county recorder's
21  office and learned that some or all of her real property
22  collateral had been lost to foreclosure.

23      Thorne simply has not persuaded us that the bankruptcy
24  court's findings regarding the Andres' discovery of the fraud
25  were illogical, implausible or without support in the record.
26  Accordingly, Thorne's statute of limitations argument fails
27  because we have no grounds to overturn the bankruptcy court's
28  discovery-related findings.

26

1

**CONCLUSION**

2    For the reasons set forth above, we AFFIRM the bankruptcy

3    court's nondischargeability judgment, except for the following:

4    (1) the portion of the judgment related to $94,903.67 in

5    allegedly misappropriated loan payments; and (2) the portion of

6    the judgment related to $14,343.08 in loan origination fees,

7    which were beyond the Andres' proportional share.  As to those

8    limited portions of the judgment, we REVERSE.

9

10

11

12    Concurrence begins on next page.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1     JURY, Bankruptcy Judge, concurring:

2

3     I concur with the result reached by the majority of the

4   Panel in affirming the liability for most of the awarded damages

5   under § 523(a)(2)(A).  I join in their decision that all the

6   damages awarded by the bankruptcy judge except for the sum of

7   $95,417 are proper.  I also agree that the $95,417 sum may not be

8   awarded as damages under either § 523(a)(2)(A) or (a)(4).

9   However, the bankruptcy court awarded all the other damages under

10  both § 523(a)(2)(A) and (a)(4).  My colleagues have chosen to

11  affirm under § 523(a)(2)(A) and therefore not address the

12  § 523(a)(4) conclusions at all (see footnote 13).  Because I

13  disagree with the analysis by which the bankruptcy court reached

14  § 523(a)(4) liability, I write separately on that issue.

15      Our case law is clear that a mere breach of fiduciary duty,

16  even if the breach is tortious and intentional as now required by

17  Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 1759 (2013), is

18  insufficient to establish liability under § 523(a)(4).  "In

19  general, a statutory fiduciary is considered a fiduciary for the

20  purposes of § 523(a)(4) if the statute: (1)defines the trust res;

21  (2) identifies the fiduciary's fund management duties; and

22  (3) imposes obligations on the fiduciary prior to the alleged

23  wrongdoing."  Blyer v. Hemmeter (In re Hemmeter), 242 F.3d 1186,

24  1190 (9th Cir. 2001).  Moreover, to fit within § 523(a)(4), the

25  fiduciary relationship must be one arising from an express or

26  technical trust that was imposed before the wrongdoing occurred.

27  Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 379 (9th Cir.

28  BAP 2011).  Under California law, an express trust requires five

1

1   elements: (1) present intent to create a trust, (2) trustee,

2   (3) trust property, (4) a proper legal purpose, and (5) a

3   beneficiary.  Id. at n. 6.  A technical trust under California

4   law is one "arising from the relation of attorney, executor, or

5   guardian, and not to debts due by a bankrupt in the character of

6   an agent, factor, commission merchant, and the like."  Id. at n.7

7   (citing Royal Indemn. Co. v. Sherman, 124 Cal.App.2d 512, 269

8   P.2d 123, 125 (Cal. Ct. App. (1954)).

9       In order for the bankruptcy court here to find liability for

10  the loans made by the Andres to Popescu based on § 523(a)(4), it

11  needed to not only find a breach of a fiduciary duty that met the

12  intentional wrongdoing standard established by Bullock, something

13  the court went at great lengths to do[1], but also to find an

14  express or technical trust with a res.  This the court did not

15  do.  Instead, it elevated the fiduciary duty of a licensed broker

16  to his clients to a level to create § 523(a)(4) liability, in

17  direct contradiction of the holding of Honkanen, where this Panel

18  held that the fiduciary relationship of a real estate licensee

19  was insufficient to create such liability because there was no

20  express or statutory trust and no trust res.  In re Honkanen,

21  446 B.R. at 381.

22      At the conclusion of the hearing where the court announced

23

---

24      [1]"Under Section 523(a)(4), the fiduciary nature of the loan
    broker that was created in 2006 and the hard money loans is a
25  palatable and important fiduciary relationship.  It's a fiduciary
    relationship of a professional.  It's a fiduciary relationship
26  that was violated in far more dramatic and material manners than
    the rather technical violation that a non-professional fiduciary
27  made in [Bullock] that caused intentional conduct."  See Hr'g Tr.
28  27:25-28:7 (March 21, 2014).

1  its oral ruling, the court was asked by the attorney for Thorne
2  "what is the res under 523(a)(4)?"  The court responded that the
3  res was all of the loan funds, "all funds involved in the entire
4  loan transactions."[2]  The court made no finding of a trust
5  relationship.  It identified no property entrusted to Thorne by
6  the Andres which were misused or not accounted for by Thorne.  In
7  sum, it did not find a trust res.

8       Without a trust res, there is no § 523(a)(4) liability.  The
9  record does not establish this alternative ground for
10 nondischargeable liability.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  ─────────────────

28       [2]Hr'g Tr. 32:7-8 (March 21, 2014).

3